1
2
3
4
5
6
7
8
9            **UNITED STATES DISTRICT COURT**

10       **CENTRAL DISTRICT OF CALIFORNIA-EASTERN DIVISION**

11

12   CODY AUSTIN BISSETT,              )    Case No. ED CV 14-00847-AS
                                       )
13              Plaintiff,             )    **MEMORANDUM OPINION**
                                       )
14       v.                           )
                                       )
15   CAROLYN W. COLVIN,               )
     Acting Commissioner of the       )
16   Social Security Administration,) 
                                       )
17              Defendant.            )
     ─────────────────────────────    )
18

19                      **PROCEEDINGS**

20       On May 7, 2014, Plaintiff filed a Complaint seeking review of the

21   denial of his application for Supplemental Security Income.  (Docket

22   Entry No. 3).   The parties have consented to proceed before the

23   undersigned United States Magistrate Judge.  (Docket Entry Nos. 9-10).

24   On September 17, 2014, Defendant filed an Answer along with the

25   Administrative Record ("AR").  (Docket Entry Nos. 13-14).  The parties

26   filed a Joint Position Statement ("Joint Stip.") on December 2, 2014,

27   setting forth their respective positions regarding Plaintiff's claims.

28   (Docket Entry No. 15).

The Court has taken this matter under submission without oral argument. See C.D. Cal. L.R. 7-15; "Order Re: Procedures In Social Security Case," filed May 12, 2014 (Docket Entry No. 7).

## BACKGROUND AND SUMMARY OF ADMINISTRATIVE DECISION

On August 12, 2011, Plaintiff (through his mother) filed an application for Supplemental Security Income, alleging a disability since July 14, 1993. (AR 160-63). On December 13, 2012, Administrative Law Judge ("ALJ"), Jesse Pease, heard testimony from Plaintiff, Plaintiff's adoptive father, and vocational expert Troy Scott. (See AR 30-75). On January 25, 2013, the ALJ issued a decision denying Plaintiff's application. (See AR 11-24). After determining that Plaintiff had severe impairments -- "attention deficit hyperactivity disorder (ADHD), combined; history of traumatic brain injury; specific learning disability; anxiety/mood disorder; and binocular vision disorder" (AR 13-14)[1] --, the ALJ found that Plaintiff had the residual functional capacity ("RFC")[2] to perform medium work[3] with the following exceptions: performance of two-to-three step complex instructions; limited to a non-public environment; limited to occasional (no more than 1/3 of the day) interpersonal contact with others; no performance of face-paced work, such as work with conveyor belts; no climbing ladders,

---

[1]    The ALJ found that cerebral palsy was not a medically determinable impairment.  (AR 14).

[2]    A Residual Functional Capacity is what a claimant can still do despite existing exertional and nonexertional limitations.  See 20 C.F.R. § 404.1545(a)(1).

[3]    "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§  404.1567(c) and 416.967(c).

ropes or scaffolds; and avoidance of extreme cold, hazardous machinery and unprotected heights. (AR 15-22).  After finding that Plaintiff had no past relevant work (AR 22), the ALJ found that jobs existed in significant numbers in the national economy that Plaintiff could perform, and therefore found that Plaintiff was not disabled within the meaning of the Social Security Act. (AR 22-23).

Plaintiff requested that the Appeals Council review the ALJ's decision.  (AR 6).  The request was denied on March 8, 2014.  (AR 1-3).  The ALJ's decision then became the final decision of the Commissioner, allowing this Court to review the decision.  See 42 U.S.C. §§ 405(g), 1383(c).

**PLAINTIFF'S CONTENTIONS**

Plaintiff alleges that the ALJ erred in failing to properly: (1) assess the credibility of the statements and testimony provided by Plaintiff's parents; and (2) develop and consider the vocational issues in this case.  (See Joint Stip. at 3-7, 16-22).

**DISCUSSION**

**A.   The ALJ Did Not Fail to Properly Assess Plaintiff's Testimony and Lay Witness Testimony**

Plaintiff asserts that the ALJ failed to properly assess the statements and testimony of Plaintiff's mother, Daniella Bissett, and Plaintiff's adoptive father, Craig Bisset.  Plaintiff further asserts

that the ALJ failed to properly assess Plaintiff's testimony. (See Joint Stip. at 3-12).[4] Defendant asserts that the ALJ properly evaluated Plaintiff's parents' and Plaintiff's credibility. (See Joint Stip. at 12-19).

1. Plaintiff's Testimony

Plaintiff made the following statements in a Function Report-Adult dated December 3, 2011:

(1) he lives at home with his family;(2) with respect to daily activities, he wakes up, takes medicine, goes to school, does chores after school, does homework, watches television, and (in his spare time) talks with friends and does magic tricks; (3) he takes care of his sister by playing video games with her or taking her swimming; (4) he gives water and food to the dogs; (5) he should try not to argue with his sister and to serve as a good example to her; (6) he could use his right arm as a baby, but the incident caused him to be paralyzed on his

---

[4]    Plaintiff's claim concerning the ALJ's assessment of lay witness testimony is based, in part, on statements purportedly made by his mother in a Disability Report (i.e., Plaintiff discontinued therapy for his right hand based on the lack of improvement after several years; Plaintiff has been in physical therapy since he was 5 months old; Plaintiff has been diagnosed with binocular vision disorder (and sometimes has double vision), but two years of eye therapy resulted in minimal improvement; without constant reminders and assistance, Plaintiff is unable to provide basic hygiene for himself; and Plaintiff's mother organizes Plaintiff's medications and gives them to him daily). (See Joint Stip. at 4, citing AR 246). Since it is not clear who made those statements, the Court will not discuss or address them. However, it appears that these statements are similar to statements made by Plaintiff's mother in the Function Report-Adult-Third Party, as discussed in the Court's opinion.

right side, for which he had to go to therapy for several years; (7) his condition affects his ability to dress according to weather conditions, bathe (use soap, clean ears, needs a reminder), shave (needs a reminder), cut fingernails and toenails (needs a reminder), and take medication and acne creams (needs a reminder); (8) he prepares his own breakfast daily and dinner approximately two times a week (frozen dinners, sandwiches, cereal, reheats leftovers); (9) he does household chores (he has to be asked, and it needs to be written down) -- putting away dishes and laundry, giving dogs water, and mowing (with supervision) -- after school (approximately 1 1/2 hours) and every other weekend (mowing, 1 hour) (10) he goes outside 5 days a week on foot or skateboard or riding in a car (when he stays home he hangs out in his room or plays video games downstairs); he does not drive because he is scared about getting in an accident; (11) he shops in stores and by computer for magic tricks and clothes (his mom does most shopping); (12) he does not pay bills, but he can count change, handle a savings account and use a checkbook (however, he does not know how to write a check); (13) his hobbies and interests are magic, Boy Scouts (which ended), Eagle Scouts (with a lot of help), hanging out with friends at school, and television; (14) he phones others and does things with others (only at school); (15) his condition affects his walking (he sometimes drags his toes), talking (difficult to understand his ideas; he has speech at school), hearing (does not hear what others say), seeing (double vision), memory (short term), completing tasks (that

involve steps), concentration (has medication for ADHD), understanding, following instructions, and using hands (his right hand has no strength and he drops things); (16) he can walk 1 hour before needing to rest for 50 minutes; (17) he can pay attention for 15 minutes (when medicated); (18) he finishes what he starts; (19) he has difficulty following instructions for recipes, but can follow the instructions for chores; (20) he can follow only the first and second spoken instructions; (21) he gets along well with teachers (although he has a hard time asking questions); (22) he does not handle stress well; he yells and has an attitude; (23) he does not handle changes in routine well; structure helps him avoid behavioral problems; (24) he has not noticed any unusal behaviors or fears; and (25) he needs glasses for double vision; he has done eye therapy (exercises) for a year.

(See AR 196-204).

At the hearing, Plaintiff (who was 19 years old at the time of the hearing) testified as follows:

In high school (Riverside Preparatory) he spent two months (four hours on Saturdays and Sundays) in a TTP program training (stacking drinks) for a position with Dollar Tree. He stopped his training when, on June 24, 2012, he got hit in the head and neck and broke his glasses. He finished high school, which he found to be stressful. He took regular classes, but was given more time to complete assignments and

tests.   He did not play sports in high school, and he last played sports when he was 4 or 5 years old.   (See AR 37-39, 42, 44-45).   When asked if he thought he could work, he said, "No.   I need a trainer."   He needs a trainer -- someone to supervise him -- so that he does not do anything wrong.   When asked why he thought he would do something wrong, he replied, "Cause sometimes I do something different than . . . the workers say.   Like I actually forget things like tasks and all that.   Like I have more than three tasks I forget one of them and have to go back."   He did not think he could get a job because he did not know what job he wanted.   (See AR 39, 43).

When asked whether he wanted to go out and work and get an apartment, he testified he did, but he was scared to drive. (See AR 43).

He mentally (smartness level) is the same as he was five years ago.   He is a little weak in his right hand; he drops things.   He forgets things.   (See AR 40-42, 47).

At the house, he does dishes, takes clothes from the washer and puts them in the dryer, puts away laundry, and mows lawns (with permission and with supervision).   (See AR 43-44).

Although it was tough to become an Eagle Scout, he did it with the help of his father.   His project was to fix and paint a sign, with the assistance of other people, in the Mojave

7

1      Regional Park in Victorville. (The City approved of the sign

2      quality.) (<u>See</u> AR 45-47).

3

4      After briefly summarizing Plaintiff's testimony (AR 16), and

5 finding that Plaintiff's Function Report-Adult was "not probative as to

6 claimant's personal assessment of his symptoms and limitations" because

7 "the responses on this form are almost identical to a function report

8 completed by the claimant's mother almost three days before on August

9 31, 2011" (AR 16), the ALJ concluded: "After careful consideration of

10 the evidence, the undersigned finds that the claimant's medically

11 determinable impairments could reasonably be expected to cause some of

12 the alleged symptoms; however, the claimant's statements concerning the

13 intensity, persistence and limiting effects of these symptoms are not

14 credible to the extent that they are inconsistent with the residual

15 functional capacity assessment herein." (<u>Id.</u>).

16

17      The ALJ then provided the following assessment of Plaintiff's

18 credibility:

19

20        The claimant has described daily activities that are not

21      limited to the extent one would expect, given the complaints

22      of disabling symptoms and limitations. The record documents

23      the claimant's activities of daily living included the

24      following: he performed household chores; he could make light

25      meals; he taught himself how to do magic tricks and he was

26      good at performing those tricks; he socialized with friends

27      and romantic interests in person and on the telephone; he

28      maintained a relationship with a girl for nine months; he

could take the bus alone to meet friends; he played the
trumpet in the high school band; he reported he had a B
average in high school; he was taking a college course; he
played videogames; and he became an Eagle Scout, although with
guidance and encouragement from his parents and scout leader
(Testimony; Ex. 5E; Ex. 5F; and Ex. 10F).   Some of the
physical and mental abilities and social interactions required
in order to perform these activities are the same as those
necessary for obtaining and maintaining employment.  While the
scope and extent of these regular activities may change from
day to day, the claimant's ability to participate in such
activities tends to suggest the clamant is far more capable
than claimant alleges and undermines the credibility of the
claimant's allegations of disabling functional limitations.

The evidence suggests the claimant's unemployment was not
due to the limiting effects of the claimant's allegedly
disabling impairments.  The claimant testified he wanted to be
independent from his parents in the future but, currently, he
did not know what job he would want.

The credibility of the claimant's allegations regarding
the severity of the claimant's symptoms and limitations is
diminished because those allegations are greater than expected
in light of the objective evidence of record.  The medical
evidence documents that mental health treatment was effective
and the claimant was stable on psychiatric medications.  The
medical evidence of record also documents orthoptics therapy

9

was effective in treating the claimant's binocular vision disorder and the claimant's history of traumatic brain injury resulted in only mild right sided weakness. The positive objective clinical and diagnostic findings since the application date detailed below do not support more restrictive functional limitations than those assessed herein.

(AR 16-17).

A claimant initially must produce objective medical evidence establishing a medical impairment reasonably likely to be the cause of the subjective symptoms. Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir. 1996); Bunnell v. Sullivan, 947 F.2d 341, 345 (9th Cir. 1991). Once a claimant produces objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged, and there is no evidence of malingering, the ALJ may reject the claimant's testimony regarding the severity of his pain and symptoms only by articulating specific, clear and convincing reasons for doing so. Brown-Hunter v. Colvin, ___ F.3d ___, 2015 WL 462013 * 5 (August 5, 2015) (citing Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007)); see also Smolen v. Chater, supra; Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998); Light v. Social Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997).

Here, substantial evidence supported the ALJ's finding that Plaintiff's testimony about the intensity, persistence and limiting effects of the symptoms was not fully credible.

10

The ALJ's finding that Plaintiff's ability to perform certain activities of daily living, such as household chores, making light meals, performing magic tricks, socializing with friends and romantic interests in person and on the telephone, maintaining a 9-month relationship with a girl, taking the bus alone to meet friends, playing trumpet in the high school band, playing video games, having a B average in high school, taking a college course, playing video games, and becoming an Eagle Scout (with extra guidance and encouragement) (see AR 43-44, 46, 54-56, 58-59, 188-91, 196-200, 463, 602-03, 613, 637-38, 806, 862, 868), was a clear and convincing reason for discrediting Plaintiff's testimony. See Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001). As the ALJ found, Plaintiff's participation in these daily activities "tends to suggest that the claimant is far more capable than claimant alleges and undermines the credibility of the claimant's allegations of disabling functional limitations." See Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999)("If a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit a claimant's allegations."); Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998)("Only if the level of activity were inconsistent with the Claimant's claimed limitations would these activities have any bearing on Claimant's credibility.").

Moreover, the ALJ properly discredited Plaintiff's testimony about his symptoms and limitations because it was not supported by the objective medical evidence. See Burch v. Barnhart, 500 F.3d 676, 681 (9th Cir. 2005)("Although lack of medical evidence cannot form the sole

basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis); <u>Rollins v. Massanari</u>, 261 F.3d 853, 857 (9th Cir. 2001)("While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects); <u>Morgan v. Commissioner</u>, 169 F.3d 595, 599-60 (9th Cir. 1999).

        The ALJ properly found that, "[w]ith respect to his mental impairments, treatment records from Kaiser Permanente document the claimant was stable with mental health treatment." (AR 17, citing AR 261-567, 630-800, 805-75). The medical records support the ALJ's statement that "psychotherapy sessions conducted since January of 2009 reflect the claimant was consistently doing well." (AR 17). On August 23, 2010, Plaintiff was feeling stress because of a request by his peers to help solve their problems with other peers, and Plaintiff was found to be only slightly anxious. (<u>See</u> AR 637-38). On December 21, 2011, although Plaintiff's mother reported Plaintiff was becoming more moody and agitated, she attributed it to the adjustment in his medication; and Plaintiff was found to be more talkative. (<u>See</u> AR 805-06). On August 8, 2012, Plaintiff was found to be more talkative and less depressed and anxious, and Plaintiff reported he had not had any anger outbursts the last 2 months. (<u>See</u> AR 861-62). On October 22, 2012, Plaintiff was found to be more calm, less depressed and anxious, and there had not been any anger outbursts in 2 months; Plaintiff's mother reported that Plaintiff had started college (one math class) and has been riding the bus to school; and Plaintiff reported that he will take the bus to visit

a female friend, that he has gone on dates with other female friends, that he is undergoing testing at college to see what kind of work he can do, and that he has not lost his temper. (See AR 867-68).

The medical records also support the ALJ's statement that "[p]sychiatric medication management visits also demonstrate that the claimant is doing well and stable on psychiatric medications, with no reported side effects." (AR 17). These records include the following notations:

a. *2009-2010*

On January 5, 2009, Plaintiff, who was taking Risperdal, Concerta and Fluoxetine, "continues to do well. No problems. No side effect." (See AR 262). On October 7, 2009, Plaintiff, who was taking Isoniazi, Pyridoxine, Risperdal, Methylin, Fluoxetine and Concerta, "has been doing well." (See AR 326-27). On January 6, 2010, Plaintiff, who was taking Fluoxetine, Methylphenidate and Concert, "has been doing well. . . . No problems with hyperactivity, impulsivity, and distractibility." (See AR 375-76). On April 21, 2010, Plaintiff, who was taking Fluoxetine, Concerta and Methylphenidate, "had 1 incident of impulsively hitting a door at home on a day when he did not take his afternoon Methylphenidate," but "Overall, he has continued to do well and is more socially and emotionally mature. No side effect from medicines." (See AR 487-78). On September 2, 2010, Plaintiff, who takes Concerta, Fluoxetine and Risperdal, does not have any medication side effects; and the plan is to "[c]ontinue current medication at current dosage since he is doing well and not having side effects." (See AR 531-32). On

October 22, 2010, Plaintiff takes Prozac, Concerta, Risperdal and Ritalin, and Plaintiff's adoptive father reported that "[Plaintiff] is doing well." (See AR 539-40).

     b.  *2011-2012*

     On February 2, 2011, Plaintiff "[h]as done well on concerta 36x2, Fluoxetine 80 mgm and rispersdal .5 mgm a day.  Occasionally takes Ritalin 20 at 5 pm" and "no medication side effects noted[.]" (See AR 643-64).   On May 10, 2011, Plaintiff was taking Fluoxetine and Risperdal, and the plan is to "[r]ecommend continuing medication as patient is stable." (See AR 660-61).  On July 21, 2011, Plaintiff was taking Concerta, Ritalin, Prozac and Risperdal, "Patient's mother reports that patient doing well current combination of medication," Plaintiff did not report any side effects from the medication, and Plaintiff was eating well, sleeping well, and had fewer episodes of agitation; and the findings of the mental status examination were unremarkable (i.e., pleasant and cooperative manner; alert, clear and oriented; normal motor activity; mostly euthymic; congruent speech; coherent, relevant and logical thought process; no psychotic or inappropriate thought content; no perceptual disturbances; and no suicidal or homicidal ideation). (See AR 675-77).  On September 15, 2011, Plaintiff was taking Concerta, Ritalin, Prozac and Risperdal, "Father reports that patient has been on this [sic] medications for long time and doing well;" and Plaintiff's mental status examination was unremarkable. (See AR 718-19).  On October 6, 2011 (with a new psychiatrist), "Mother reported (and [Plaintiff] confirmed) that [Plaintiff] has been on the same medications since grade 6th and

generally doing well", Plaintiff was going to try a lower dosage of Concerta to see if it helped his impulsivity, and Plaintiff did not suffer any side effects from the medication; and Plaintiff's mental status examination was unremarkable. (See AR 729-32). On December 9, 2011 (with the new psychiatrist), the doses of Concerta and Prozac would be cut, "Father stated that [Plaintiff] still takes Ritalin in the afternoon and he uses that as needed when he is really impulsive or agitated and it helps him when needed;" and Plaintiff's mental status examination was unremarkable. (See AR 761-63). On March 16, 2012, the reduction of the doses was "not good at all" (Plaintiff was more unstable, stressed, frustrated, angry, sad and had mood changes), and the doses of Concerta and Prozac would be returned to their normal levels; and Plaintiff's mental status examination showed he was somewhat depressed, and his affect was mood congruent and restricted in range (which his adoptive father attributed to the change in his doses, and Plaintiff could not relate his changed mood and increased level of frustration to any new stressors). (See AR 815-18). On July 6, 2012, Plaintiff was taking Methyphenidate, Fluoxetine, Risperdal, and Methylphenidate, "Mother (and [Plaintiff] reported [Plaintiff] has been doing well on current medications. He is back to 'his normal' on the higher dose of the stimulant", and Plaintiff denied uncontrolled symptoms of attention problem, anger or mood disorder; and Plaintiff's mental status examination was unremarkable. (See AR 845-47). On August 8, 2012, Plaintiff stated he has been taking his medication and has not had an anger outburst in the last two months, and Plaintiff was found to be more talkative and less depressed and anxious. (See AR 861-62). On October 22, 2012, "[Plaintiff] reported (and his mother confirmed) that he has been doing generally well on current medications;" and

15

Plaintiff's mental status examination was unremarkable. (See AR 870-72).

The objective medical evidence supports the ALJ's finding that Plaintiff had only mild weakness in his right side. (See AR 17). A Physical Therapy MTU Summary for the period October 2005 to April 2007, which was completed on May 8, 2009, stated, inter alia, that: Plaintiff's mother "does not have any concerns on Cody's physical abilities, she is very pleased with his progress"; Plaintiff has appropriate social/interactive skills, including giving eye contact, following 1- and 2-step commands, staying on task in one place; Plaintiff is independent with respect to most daily living skills (except needs supervision on curbs and in and out of bathtub); Plaintiff is "ambulatory with good stamina and strength," "plays sports at school and at home," and "rides bikes and is able to get around the home and community independently"; Plaintiff has mild hypertonia (increased tension of the muscles) in his right and left lower extremities; Plaintiff has normal range of motion, good balance, and normal muscle strength; Plaintiff has a good functional gait pattern, but tends to drag his right toe and to decrease his right arm swing when rushing; and "Physical therapy is not recommended at this time and will recommend patient to participate in school, home and community physical activities." (See AR 450-53).

Similarly, an Occupational Therapy MTU Summary for the period June 12, 2008 to June 30, 2009, completed on July 1, 2009, stated, inter alia, that Plaintiff has appropriate social/interactive skills; Plaintiff is independent with respect to most daily living skills

(except needs supervision with bathing); Plaintiff has normal tone in his left upper extremity and very mild hypertonia in his right upper extremity (right arm and hand); Plaintiff has a full active and passive range of motion in his bilateral upper extremities; Plaintiff has good balance; Plaintiff's upper extremity strength in both arms and hands is within normal limits; Plaintiff is "ambulatory with good stamina and strength," "plays sports at school and at home," and "rides bikes and is able to get around the home and community independently"; and "There are no present concerns for his advanced [daily living] skills and use of right arm and hand.  (See AR 458-61).

An Occupational Therapy MTU Summary for the period June 30, 2009 to June 28, 2010, completed on June 28, 2010, stated, inter alia, that Plaintiff has appropriate social/interactive skills; Plaintiff is mostly independent with respect to most functional skills (he needs moderate assistance drawing an X with a pencil and needs supervision bathing); Plaintiff has normal tone in his left upper extremity and very mild hypertonia in his right upper extremity (right arm and hand); Plaintiff has a full active and passive range of motion in his bilateral upper extremities; Plaintiff has good balance; Plaintiff's upper extremity strength in both arms and hands is within normal limits; Plaintiff "is ambulatory with good stamina and strength," "plays sports at school and at home," and "rides bikes and is able to get around the home and community independently;" and "There are no present concerns for his advanced [daily living] skills and use of right arm and hand." (See AR 462-65).  A Kaiser Permanente Progress Note dated July 3, 2012 reflected that because of Plaintiff's recent injury, Plaintiff had tenderness over his left neck muscles and a decreased range of motion and has had some

17

residual right upper extremity strength/fine motor skill issues, but has "[m]ade a great recovery overall." (See AR 835-36).

On April 19, 2012, consultative examiner Sarha L. Maze, M.D. (neurologist) stated the following positive findings from the neurological examination: Plaintiff's voice is somewhat soft; he has slight right upper body weakness; he has a slight slowness on the right for finger-nose-finger and rapid alternating movements; rhythmic-toe-tapping is performed with mild slowness on the right and performed well on the left; and with respect to gait, the Romberg test is equivocally positive, and he ambulates in a very stable manner, walks independently and is unsteady with attempted tandem walk. Dr. Maze found that Plaintiff has a "slight slowness with coordinated movements in the right side of his body," but that he "compensates very well for his slight right body weakness." (See AR 801-04). As the ALJ noted, Plaintiff was determined to be neurologically intact throughout the course of treatment (AR 19, citing AR 261-567, 729-800, 805-928) and "[t]here was no other significant positive findings related to the claimant's mild right arm weakness due to history of traumatic brain injury at age four months documented in the record" (AR 19).

The objective medical evidence also supports the ALJ's finding that Plaintiff's binocular vision disorder was effectively treated. (AR 17). On October 29, 2010, Plaintiff was diagnosed with binocular vision disorder and was prescribed home ocular therapy (exercises). (See AR 630-35). On February 4, 2011, Plaintiff was told to continue with his home ocular therapy. (See AR 651-53). On August 11, 2011, Plaintiff had an eye examination, which showed that Plaintiff's visual acuity in

both eyes was 20/20; Plaintiff was reported to be happy with the progress of the orthoptics at home; and Plaintiff was released from the program, but was advised to continue to do certain exercises as maintenance. (See AR 700-06). There is no indication at the time of the April 19, 2012 neurological consultative examination that Plaintiff was suffering from double vision. (See AR 802-03). On June 25, 2012 (the day after suffering a blunt injury to the head), Plaintiff reported seeing double; a CT scan of his head taken the day before showed normal results; and Plaintiff was diagnosed with intermittent exotropia with double vision and mild hyperopia. (See AR 822-24, 829-30). On July 9, 2012, it was noted that Plaintiff "see[s] double with out [sic] glasses, but not with using both eyes" and "see[s] double monoc with glasses each eye"; and Plaintiff was restarted on home ocular therapy. (See AR 852-60). On July 25, 2012 (the day after receiving new glasses), Plaintiff reported he still had double vision without his glasses. (See AR 880-81). On August 7, 2012, it was noted that Plaintiff's current orthoptics treatment was related to Plaintiff's recent injury and was not connected to any past treatments; Plaintiff reported that he was doing great with his new glasses with a prism, but that he saw double when he took them off; and Plaintiff was told to continue with the home ocular therapy. (See AR 884-92). On August 28, 2012, Plaintiff reported that he had made good progress with the orthoptics at home; and Plaintiff was told to do a modified home ocular therapy. (See AR 899-04). On September 20, 2012, Plaintiff reported that he still has double vision, which is slightly improved with the glasses, and that he is improving very slowly. (See AR 905-07). On September 27, 2012, Plaintiff reported he still gets double vision with his old glasses, that he does not get double vision with his new glasses (but still has

a problem with depth perception), and that he had made overall good progress with the orthoptics at home; and Plaintiff was told to continue with a modified home ocular therapy. (See AR 909-14).  On October 16, 2012, Plaintiff reported he did not see double with his new glasses, that he saw double with his old glasses (but did not have any more headaches), and that he "[s]till feels off but getting better"; Plaintiff was prescribed a new pair of glasses with less prism in order to improve depth perception and was told to continue the same home ocular therapy. (See AR 920-25).

The Court's review of the record reveals that the ALJ provided clear and convincing reasons for not finding Plaintiff's testimony fully credible.

B.   <u>Lay Witness Testimony</u>

Plaintiff's mother made the following statements in a Function Report-Adult-Third Party dated August 31, 2011:

(1) she has known Plaintiff since birth, Plaintiff lives at home, and she spends time with Plaintiff after school and on weekends teaching him life skills; (2) with respect to daily activities, Plaintiff wakes up, takes medication, goes to school, does chores after school, does homework, watches television, and (in his spare time) talks with friends and practices magic tricks; (3) when told, Plaintiff plays video games with his 9-year old sister and/or takes her swimming; (4) when told, Plaintiff gives water to dogs; (5) she has to

intervene when Plaintiff argues with his sister; (6) Plaintiff could use his right arm as a baby, but when he was four months old an incident (Shaking Baby Syndrome) caused him to be paralyzed on his right side; (7) with constant reminders, Plaintiff can dress according to weather conditions, bathe (use soap!, clean ears!), shave, cut fingernails and toenails, and take medication and acne creams; (8) Plaintiff prepares his own breakfast daily and dinner approximately two times a week (frozen dinners, sandwiches, cereal, reheats leftovers); (9) with reminders, including written reminders, Plaintiff does household chores -- putting away dishes and laundry, giving dogs water, mowing (with supervision) -- after school (approximately 1/2 hour) and every other weekend (mowing, 1 hour); (10) Plaintiff goes outside 5 days a week (but sometimes less, and not to hang out with friends) on foot or skateboard or riding in a car; Plaintiff does not drive because he is scared and not mature enough (he has tantrums and gets angry about little things); (11) Plaintiff shops in stores once a month for magic tricks and clothes (his mom does most shopping); (12) Plaintiff does not pay bills, but he can count change, handle a savings account and use a checkbook (however, he does not know how to write a check or use an ATM machine); (13) Plaintiff's hobbies and interests are Boy Scouts (which ended), Eagle Scouts (with a lot of help), television, magic, and school friends; (14) Plaintiff phones others and does things with others (only at school), and regularly goes to doctor appointments and school dances (2 times a year); (15) Plaintiff's condition affects his walking

21

(he sometimes drags his toes), talking (difficult to understand his ideas; he has speech at school), hearing (does not hear what others say), seeing (double vision), memory (short term), completing tasks (that involve steps), concentration (has medication for ADHD), understanding, following instructions, and using hands (his right hand has no strength and he drops things); (16) Plaintiff can walk 1/2 hour before needing to rest for 10 minutes; (17) Plaintiff can pay attention for 20 to 30 minutes (when medicated); (18) Plaintiff finishes what he starts; (19) Plaintiff has difficulty following instructions for recipes, but can follow the instructions for chores; (20) Plaintiff can follow only the first and second spoken instructions, but then will forget or get confused; (21) Plaintiff gets along well with teachers (although he has a hard time asking questions), but he argues with his parents; (22) Plaintiff does not handle stress well; he yells and has tantrums; (23) Plaintiff does not handle changes in routine well; (24) When Plaintiff does not take medication, he has impulsive behaviors, such as turning off water to the washer/dryer and toilet, disconnecting the garage door, standing on the outer edge of the staircase, and standing on a chair to look out the window; (25) Plaintiff needs glasses for double vision; he has done eye therapy (exercises) for more than a year; and (26) even with weekly physical and occupational therapy and even with home therapy, Plaintiff still has partial paralysis in the right hand.

(See AR 187-94).

At the hearing, Craig Bissett, Plaintiff's adoptive father (AR 47), testified as follows:

He has been involved with Plaintiff since Plaintiff was 7 years old and adopted Plaintiff when Plaintiff was 9 years old. (See AR 48, 61). Plaintiff got better for a while, but in the 7th or 8th grade Plaintiff had to go to the Sylvan Center 2 or 3 days a week (tests initially showed he was one or two levels behind grade level in the majority of subjects). (See AR 48-49). Plaintiff has always been in special education programs, and has done Individualized Education Programs every year. Plaintiff's high school did not have a separate program or separate modular, but rather integrated him in the class and had aides to assist him with different classes. Prior to beginning college, Plaintiff tested at the lowest levels in English and math. Plaintiff is taking one class (a low-level class geared for struggling students), some of it online and some of it with assistance from a teacher, at Victor Valley College in the High Desert. (See AR 55-57). Plaintiff has difficulty remembering simple directions (i.e., taking a pizza out of the oven when the timer goes off, doing a task he was not supposed to do while in a high school job training program), and has difficulty filling out simple forms (at the dentist or the doctor's office) and following simple instructions (i.e., a simple cooking recipe). He gets very frustrated and angry and shuts down (i.e., a college instructor told him he was going to have to take a couple of tests next week, he gets angry with himself, he lashes out at

23

people).  He acts impulsively (i.e., grabbing the steering wheel when his mother is driving).  He does not have any concept of money (i.e., thinking a $3.99 price at the gas station is for the whole car, not knowing how much change he is supposed to receive after paying for an item).  He has difficulty taking care of himself; his mother has to tell him to clip his nails, to wash himself, and to put on deodorant. (See AR 53-54, 59-61).  Plaintiff no longer lashes out at family members because he is on a lot of medication.  (See AR 60).  Plaintiff had a double vision issue years ago.  His vision problems improved and became stable.  When Plaintiff recently was hit in the head, his vision problems reappeared. Plaintiff has three pairs of glasses with different prism levels.  After wearing one pair of glasses for a while, he begins to have double vision and headaches, and then changes to another pair of glasses.  (See AR 59).  Plaintiff does house chores, such as helping with yard work and mowing or picking up leaves, but requires supervision because he wanders off or becomes confused about the task.  Plaintiff is not given a specific schedule for chores based on his inability to remember.  (See AR 54-55).  Plaintiff has done some bike riding, but he stopped after injuring himself during a fall. Plaintiff has skateboarded with a helmet and gloves, but he had an accident due to a problem with balance.  His partial paralysis makes it more difficult for him to use his right hand and arm when the weather gets colder.  As a child, Plaintiff tried to play baseball (but he got injured due to his lack of coordination) and soccer (which Plaintiff could

24

not play).  Plaintiff went to summer camp, but needed to be taken from point to point and to have everything broken down. (See AR 57-58).  Plaintiff was involved in Boy Scouts and became an Eagle Scout, which happened only because of the great effort and extra time given by the leader and the efforts of Plaintiff's parents.  (See AR 58-59).

After briefly summarizing the testimony and statements provided by Plaintiff's mother and adoptive father, the ALJ provided the following assessment:

While a layperson can offer an opinion on a diagnosis, the severity of the claimant's symptoms, or the side effects of medications in relationship to the claimant's ability to work, the opinion of a layperson is far less persuasive on those same issues than are the opinions of medical professionals as relied on herein.  The opinion of the claimant's adoptive father/stepfather and mother are not unbiased ones because they have a familial motivation to support the claimant as well as a financial interest in seeing the claimant receive benefits, given they are the claimant's only source of financial support.  Most important, their statements are not supported by the clinical or diagnostic medical evidence that is discussed elsewhere in this decision. Notably, at psychiatric medication management visits and psychotherapy sessions, which the claimant routinely attended with his adoptive father or mother, the claimant's parents consistently reported the claimant was doing well with

1       psychiatric medications.  The undersigned finds the statements

2       of the claimant's adoptive father/stepfather are not credible

3       to the extent their statements are inconsistent with the

4       residual functional capacity assessment herein.

5

6 (AR 21-22).

7

8     The ALJ is required to give germane reasons for rejecting or

9 partially rejecting lay witness testimony.   See Carmickle v.

10 Commissioner, 533 F.3d 1155, 1164 (9th Cir. 2008); Greger v. Barnhart,

11 464 F.3d 968, 972 (9th Cir. 2006); Smolen v. Chater, 80 F.3d 1273, 1288-

12 89 (9th Cir. 1996).

13

14     Some of the reasons given by the ALJ -- that Plaintiff's mother and

15 adoptive father are not medical professionals, and that the testimony

16 and statements they provided are biased because they have a financial

17 interest, and unsupported by the clinical or diagnostic medical evidence

18 -- were not germane reasons for discrediting or partially discrediting

19 their testimony.  See Valentine v. Commissioner Social Security Admin.,

20 574 F.3d 685, 694-95 (9th Cir. 2009) ("[F]riends and family members in

21 a position to observe a claimant's symptoms and daily activities are

22 competent to testify as to [his or] her condition."); Sprague v. Bowen,

23 812 F.2d 1226, 1232 (9th Cir. 1987)("[D]escriptions by friends and

24 family members in a position to observe [Plaintiff's] symptoms and daily

25 activities have routinely been treated as competent evidence."); Smolen

26 v. Chater, supra, 80 F.3d at 1289 (Discrediting "family witnesses"

27 because they were "understandably advocates, and biased" "amounted to a

28 wholesale dismissal of the testimony of all the witnesses as a group and

therefore does not qualify as a reason germane to each individual who testified.  Moreover, the same could be said of any family member who testified in any case.  The fact that a lay witness is a family member cannot be a ground for rejecting his or her testimony."); Taylor v. Commissioner of Social Sec. Admin., 659 F.3d 1228, 1234 (9th Cir. 2011) ("'Nor under our law could the ALJ discredit [their] lay testimony as not supported by medical evidence in the record.'") (quoting Bruce v. Astrue, 557 F.3d 1113, 1116 (9th Cir. 2009).

However, the ALJ's discrediting of the testimony and statements by Plaintiff's mother and adoptive father because it was inconsistent with statements they repeatedly made to medical personnel about Plaintiff's doing well on medication was a germane reason.  See Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 20015) ("Inconsistency with the medical evidence" is a germane reason for discrediting the testimony of a lay witness; Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001)("One reason for which an ALJ may discount lay testimony is that it conflicts with medical evidence.").  As discussed above, the record is replete with statements made by the Plaintiff's mother and adoptive father about Plaintiff doing well on his medication.  (See AR 262 [January 5, 2009]; 326-27 [October 7, 2009, noting that Plaintiff "is accompanied by mother and has been doing well"]; 375-76 [January 6, 2010, noting that Plaintiff "is accompanied by mother and has been doing well" and that "[n]o problems with hyperactivity, impulsivity, and distractibility"]; 487-78 [April 21, 2010, noting that Plaintiff "is accompanied by mother, that he "had 1 incident of impulsively hitting a door at home on a day when he did not take his afternoon Methylphenidate," that "[o]verall, he has continued to do well and is more socially and emotionally mature,'

27

and that "[n]o side effect from medicines."]; 531-32 [September 2, 2010, noting that Plaintiff does not suffer any side effects and to "[c]ontinue current medication at current dosage since he is doing well and not having side effects"]; 539-40 [October 22, 2010, noting that "[a]ccording to dad [Plaintiff] is doing well"]; 643-64 [February 2, 2011, noting that Plaintiff, who was with his adoptive father, has done well on prescribed medications and that "no medication side effects noted"]; 660-61 [May 10, 2011, recommending to continue the medication "as patient is stable"]; 675-76 [July 21, 2011, noting that "Patient's mother reports that patient doing well current combination of medication"]; 718-19 [September 15, 2011, noting that "Father reports that patient has been on this [sic] medications for long time and doing well"]; 729-32 [October 6, 2011, noting that "Mother reported (and [Plaintiff] confirmed) that [Plaintiff] has been on the same medications since grade 6th and generally doing well"]; 761-62 [December 9, 2011, noting that "Father stated that [Plaintiff] still takes Ritalin in the afternoon and he uses that as needed when he is really impulsive or agitated and it helps him when needed"]; 845-46 [July 6, 2012, noting that "Mother (and [Plaintiff] reported [Plaintiff] has been doing well on current medications" and that "[h]e is back to 'his normal' on the higher dose of the stimulant"]; 861-62 [August 8, 2012, noting that Plaintiff stated he has been taking his medication and has not had an anger outburst in the last two months]; and 870-71 [October 22, 2012, noting that "[Plaintiff] reported (and his mother confirmed) that he has been doing generally well on current medications"]).

The Court also finds that even assuming, _arguendo_, that the ALJ failed to give a germane reason for discrediting the testimony of

Plaintiff's mother and adoptive father, any error was harmless.  See Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008)(an ALJ's error is harmless "when it is clear from the record . . . that it was 'inconsequential to the ultimate nondisability determination.'"); Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)("A decision of the ALJ will not be reversed for errors that are harmless.").  Thus, the ALJ's error, if any, in failing to properly reject the lay witness testimony is harmless because the ALJ provided clear and convincing reasons for finding Plaintiff's testimony not fully credible, and that testimony essentially described the same limitations as those testified to by Plaintiff's mother and adoptive father.  See Molina v. Astrue, 674 F.3d 1104, 1122 (9th Cir. 2012)("Although the ALJ erred in failing to give germane reasons for rejecting the lay witness testimony, such error was harmless given that the lay testimony described the same limitations as Molina's own testimony, and the ALJ's reasons for rejecting Molina's testimony apply with equal force to the lay testimony.").

**B.   The ALJ Properly Developed and Considered the Vocational Evidence in this Case**

Plaintiff asserts the ALJ erred in finding, based on the vocational expert's testimony, that Plaintiff is able to perform the occupations of hand packager, electronics worker, and kitchen helper. (See Joint Stip. at 20-22).  Defendant asserts that substantial evidence supports the ALJ's finding that Plaintiff could perform such jobs. (See Joint Stip. at 22-24).

At the hearing, the ALJ asked the vocational expert to assume whether the following hypothetical person -- a high school graduate; limited to medium work; able to perform two- to three-step complex instructions; limited to a non-public environment (not working directly with the public); limited to occasional (1/3 of a day) inter-personal contact with others; no fast-paced work such as a conveyor belt; no ladders, ropes or scaffolds; no extreme cold; no hazardous machinery or unprotected heights -- could perform any work.   (AR 64).

The vocational expert testified that such a person could perform the following jobs: (1) hand packager, Dictionary of Occupational Titles ("DOT") 920.587-018[5] (unskilled, Specific Vocational Preparation ("SVP") 2, 16,000 positions in the regional economy, 165,000 positions in the national economy); (2) electronic worker, DOT 726.687-010[6] (unskilled,

---

[5]   DOT 920.587-018 (packager, hand) requires inter alia: strength ("Medium work - Exerting 20 to 50 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or 10 to 25 pounds of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) and/or greater than negligible up to 10 pounds of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects)"), and constant (2/3 or more of the time) reaching, handling and fingering. DOT 920.587-018, 1991 WL 687916.

[6]   DOT 726.687-010 (electronics worker) requires inter alia: strength ("Light work - Exerting up to 20 pounds of force occasionally . . . and/or up to 10 pounds of force frequently . . . and/or a negligible amount of force constantly . . . ."); language ("READING: Passive vocabulary of 5,000-6,000 words.  Read at rate of 190-215 words per minute.   Read adventure stories and comic books, looking up unfamiliar words in dictionary for meaning spelling, and pronunciation. Read instructions for assembling model cars and airplanes."); writing ("Write compound and complex sentences, using cursive style, proper end punctuation, and employing adjectives and adverbs."); speaking ("Speak clearly and distinctly with appropriate pauses and emphasis and correct punctuation, variations in word order, using present, perfect, and future tenses"); frequent reaching, handling and fingering; and

(continued...)

SVP 2, 5,000 positions in the regional economy, 80,000 positions in the national economy; and (3) dishwasher, DOT 318.687-010[7] (unskilled, SVP 2, 17,000 positions in the regional economy, 280,000 positions in the national economy).  (See AR 65-67).

The vocational expert testified that the following changes to the original hypothetical would not have any effect on these jobs:  the limitation that such a person could not walk on uneven terrain (see AR 67-68).

The vocational expert testified that the following changes to the original hypothetical would effect that person's ability to perform all of these jobs:  the limitation that such a person had a problem with depth perception (see AR 68-69).

The vocational expert testified that the following changes to the original hypothetical would eliminate all of these jobs:  the limitation that such a person would need additional supervision on a continual basis to remain on task  (see AR 70-71), the limitation that such a person would work at a reduced productivity rate (25% below average) (see AR 72), and the limitation that such a person would require

---

[6] (...continued)
occasional depth perception.  DOT 726.687-010, 1991 WL 679633.

[7]    DOT 318.687-010 (kitchen helper) requires inter alia: strength ("Medium work – Exerting 20 to 50 pounds of force occasionally . . . and/or 10 to 25 pounds of force frequently . . . and/or greater than negligible up to 10 pounds of force constantly . . . to move objects."); . . . ."); constant reaching and fingering; occasional fingering; and : frequent reaching, handling and fingering; and occasional exposure to extreme cold.  DOT 318.687-010, 1991 WL 672755.

unscheduled breaks that would accumulate to about 4 hours out of the work week (because he or she is going to be off task)(see AR 72-73).

The vocational expert testified that the following changes to the original hypothetical would eliminate the hand packager and dishwasher jobs (but not the electronic worker job): the limitation that such a person could stand and walk 2 out of 8 hours (see AR 69-70).

The vocational expert testified that the following changes to the original hypothetical would eliminate the dishwasher job: the limitation that such a person had monocular vision (vision in only one eye) (see AR 73-74).

The ALJ found that, considering Plaintiff's age, education, work experience, and residual functional capacity, Plaintiff was able to perform work as an hand packager (medium, unskilled), electronic worker (light, unskilled), and dishwasher (medium, unskilled), all of which exist in significant numbers in the national economy.  (AR 22-23).

Plaintiff's contention that he is not able to perform the occupation of hand packager because of his right upper extremity impairment and his binocular vision disorder (see Joint Stip. at 20-21) fails.  The ALJ's finding that Plaintiff's RFC did not include any limitation with respect to his right upper extremity or with respect to his binocular vision disorder was supported by the objective medical evidence, as discussed above, and the ALJ properly discredited the testimony that Plaintiff, Plaintiff's mother, and Plaintiff's adoptive

father gave concerning Plaintiff's alleged limitations in those areas, as discussed above.

Plaintiff's contention that he is not able to perform the occupation of electronics worker because of his language limitations and his right upper extremity impairment and because it requires occasional depth perception (see Joint Stip. at 22) is also without merit. The ALJ's finding that Plaintiff's RFC did not include any limitation with respect to his language skills (i.e., reading, writing and speaking) was supported by evidence in the record: (1) Plaintiff was noted to be "quite verbal with a good vocabulary" (see AR 451, 455, 464); (2) An April 5, 2011 Individual Program Plan noted that Plaintiff "is doing well in school" (see AR 601, 603); (3) A teacher questionnaire, completed on September 29, 2011, indicated that Plaintiff did not have any problems in conversation and that he used adequate vocabulary and grammar to express his thoughts and ideas (see AR 208); (4) Plaintiff had graduated from high school and was taking a college course (see AR 56, 868); and (5) as the ALJ noted, there are no medical source statements stating that Plaintiff has language limitations (AR 21). Although Plaintiff may have had some difficulty in school (see e.g., AR 205-07, 570-79, 595), there is no indication that Plaintiff did not have the language skills to perform the electronics worker job.

Finally, Plaintiff's contention that he is not able to perform the occupation of dishwasher because of his right upper extremity impairment and because it requires occasional exposures to extreme cold temperatures (see Joint Stip. at 22) also fails. The ALJ's finding that

Plaintiff's RFC did not include any limitation with respect to his right upper extremity was supported by the objective medical evidence, as discussed above. Moreover, the ALJ's RFC determination included the limitation that Plaintiff needed to avoid *extreme cold weather*. However, the DOT description for the dishwasher position only involves *occasional* exposure to extreme cold. <u>See</u> DOT 318.687-010.

The Court finds that even if the ALJ erred in finding that Plaintiff could perform the occupations of electronics worker and dishwasher, the ALJ's finding that Plaintiff could perform the occupation of hand packager renders any such error harmless.

**ORDER**

For the foregoing reasons, the decision of the Commissioner is affirmed.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED: September 9, 2015

_____
/s/
ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE

34